IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2005

**STATE OF TENNESSEE v. ROOSEVELT MORRIS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-06321     Arthur T. Bennett, Judge**

---

**No. W2004-02277-CCA-MR3-CD - Filed September 7, 2005**

---

The Defendant, Roosevelt Morris, was convicted by a jury of two counts of attempted first degree premeditated murder. The trial court sentenced the Defendant as a Range I, standard offender to two consecutive terms of twenty-five years in the Department of Correction for an effective sentence of fifty years. In this direct appeal, the Defendant challenges the sufficiency of the evidence and contends that his sentence is excessive. We affirm the Defendant's convictions. We modify the Defendant's effective sentence to forty-seven years.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Garland Ergüden, Memphis, Tennessee, for the appellant, Roosevelt Morris.

Paul G. Summers, Attorney General & Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Teresa Washington testified that she met and began dating the Defendant, Roosevelt Morris, in December 2000. In approximately September 2001, the two began living together in a residence on Glankler. In approximately November 2001, the Defendant moved out of the residence, taking his furniture with him. Ms. Washington stated that she "just no longer want[ed] to be with him. He was controlling." Ms. Washington testified that after the Defendant left, he started calling her and going by her residence and her work-place. She did not want or invite or encourage these calls or visits.

Ms. Washington stated that the Defendant threatened her, "say[ing] things like he wasn't going to leave [her] alone. And that if he couldn't have [her], no one else could have [her.]" When Ms. Washington met James Davis in January 2002 and began dating him, she sought and obtained an order of protection against the Defendant. The order was entered by the general sessions court of Shelby County, Tennessee, on February 12, 2002. A copy of the order was admitted into evidence and provides, in pertinent part, that the Defendant "is refrained from coming about [Ms. Washington] for any purpose and specifically from abusing, threatening to abuse [her], or committing any acts of violence upon [her]." The order also prohibited the Defendant from telephoning Ms. Washington, stalking her, and committing acts of violence against her property. According to Ms. Washington, the Defendant was not deterred by the order, but continued to call her and come over to her home. She stated that, at one point, he "pulled up all [her] landscaping and put black tar over [her] motion detector lights so that they wouldn't go off and unscrewed [her] light bulbs."

Ms. Washington testified that the Defendant called her on the morning of May 17, 2002, and told her he "had something for [her]." She replied that he did not have anything for her and hung up. That night, she arrived home at about 12:30 a.m. Mr. Davis was already at her home. She parked her car behind his in the single lane driveway. She went to bed with Mr. Davis but heard noises that sounded like someone was outside. She told Mr. Davis but he replied that it was just the wind. She tried to look out of her windows with a flashlight but did not see anything.

She and Mr. Davis woke up at about four o'clock that morning. Mr. Davis had to leave to go to work. Ms. Washington went out of the house so that she could move her car in order that Mr. Davis could leave in his car. She opened the front door and began to open the glass storm door. Mr. Davis was standing behind her. Ms. Washington described what happened next:

> I opened my door and I seen someone standing over to my right and I screamed. And I seen this flashing, a boom go off. And it went off again. I just saw a flash. So I fell out on my floor and I played dead.

Ms. Washington said that, with the second "boom," which was just seconds after the first one, she felt a bullet go past her left temple. As she was laying in the doorway curled in a fetal position "playing dead," she felt the person step over her into the house. She then heard more gunshots and the sound of one or more persons falling to the floor. Ms. Washington next heard Mr. Davis pleading for his life and telling the intruder to let the gun go. At that point, she testified, she heard the Defendant's voice. The Defendant said that they had ruined his life and that he was going to kill them.

When Ms. Washington realized who the intruder was, she jumped up and ran to see if she could assist Mr. Davis in wresting the gun from the Defendant. The two men were on the floor struggling, with Mr. Davis on top of the Defendant. Ms. Washington jumped on Mr. Davis' back and reached down, trying to get the gun away from the Defendant. She then noticed that the Defendant was wearing gloves. At that point, she testified, she "just panicked and . . . just went after

[the Defendant's] eyeballs."  Ms. Washington tried to gouge out the Defendant's eyes with her fingers.

Ms. Washington did not realize that Mr. Davis had been shot.  As she was on his back trying to injure the Defendant, Mr. Davis told her that he had been shot and that she was "smushing" him such that he couldn't breathe.  Ms. Washington got off of Mr. Davis and ran to a neighbor's house to call the police.  When the neighbor answered the door, she explained what was happening.  The neighbor called the police and would not let Ms. Washington leave until the police arrived.

James Davis testified that he is six feet, two inches tall and weighs 280 pounds.  He stated that he knew of the Defendant prior to the shooting, but had not met him.  They had spoken over the telephone three or four times when the Defendant was seeking to speak to Ms. Washington.  Mr. Davis stated that his conversations with the Defendant during these calls were not hostile.

Mr. Davis testified that, on the night in question, he arrived at Ms. Washington's house at around midnight; Ms. Washington was already there.  They went to bed and woke up at about four o'clock a.m.; he was running late for work and was in a hurry.  When he went to leave, Ms. Washington was in front of him at the front door.  Mr. Davis testified:

> Ms. Washington opened the inner door and she unlocked the outer door and all of a sudden a body appear.  I hear a shot, boom, she screams, she falls.  And, well, after that this gentleman entered the house, he shoots me and he's just goes shooting three or four more times.

Mr. Davis testified that the "gentleman" was wearing a cap, a black jacket and black jeans.  He was also wearing black gloves.

Mr. Davis stated that he thought he recognized the intruder as a man that he had seen walking in front of the house a number of times.  Mr. Davis explained that the intruder was the same height and had the same "high cheekbones" as the man he had seen previously.

Mr. Davis explained that the intruder shot him as he stepped over Ms. Washington and entered the house.  Mr. Davis was shot in the right chest.  The intruder shot several more times as he came into the house.  The shots then paused and Mr. Davis noticed that the intruder was "messing with" the gun because it had "jammed."  At that point, Mr. Davis threw his hands around the intruder's neck and "throwed him on [the] floor."  The intruder hit his head on the coffee table as the two men fell to the floor.  The two men began struggling over the gun.  The intruder said, "Y'all don't know what love is.  Y'all done ruined my life."

The men continued to struggle over the gun.  Ms. Washington got up and jumped on Mr. Davis' back.  She tried to gouge out the intruder's eyes and was jumping up and down on Mr. Davis while doing so.  Mr. Davis told her to "get up" because he had been shot.  Ms. Washington then ran out of the house.

Mr. Davis kept trying to get the gun away from the intruder but he would not let it go. After Ms. Washington left, he finally let go of it. Mr. Davis stated that the intruder then got up and ran away. Mr. Davis was not able to chase after him, but made it out onto the front porch. He hollered for help but kept getting weak. He laid down on the porch and the next thing he knew, the police were there. They discovered a handgun under Mr. Davis and took control of it. The paramedics then arrived and took Mr. Davis to the hospital.

Mr. Davis identified the Defendant at trial as the intruder who shot him. Mr. Davis also identified a cap recovered at the scene as the one worn by the Defendant during the attack.

Officer James Gaylor received a "shots fired" call and responded to the scene at about 4:45 in the morning on May 18, 2002. He saw a man lying on the porch who appeared to be hurt or wounded. Officer Gaylor approached and noticed a handgun laying under the man; the man did not have the gun in his hand. Officer Gaylor recovered the gun and handed it to Officer Paul Bishop, who had also arrived on the scene.

Officer Paul Bishop testified that he checked the gun and found one live round in the chamber, none in the magazine. Officer Bishop described the gun as a .380 semiautomatic. Officer Bishop identified the gun at trial and it was admitted into evidence. He stated that he determined during his investigation that the gun had not been reported stolen, but he did not know who owned the gun.

Officer Bishop explained that Ms. Washington was across the street when he arrived, "frantically screaming." She came over to them as they were attending to Mr. Davis. Officer Bishop stated that it took about an hour for Ms. Washington to tell him what had happened. By this time, Mr. Davis had been transported to the hospital. Officer Bishop testified as to what Ms. Washington told him as follows:

> She stated that her boyfriend, Mr. Davis, had to go to work. That she had to move her car, it was a single car driveway with the two cars parked in the drive. She said that she opened the door, she saw something off to the side and then heard two shots. The door that she had opened was a wrought iron door that had glass panels in it. The glass panel shattered. She fell backwards into the house.
> She then stated that, that she was laying on the ground when her ex-boyfriend rushed into the house, more shots were fired. Mr. Davis was struck. That the two were wrestling on the ground. And she told me that she tried to gouge his eyes out.

Officer Bishop also stated that Ms. Washington told him the attacker's name was Roosevelt Morris. She also told him that Mr. Morris had threatened her over the phone the day before, telling her he had "something for [her]." Ms. Washington told Officer Bishop about the order of protection.

Officer Bishop went to the hospital later that morning and spoke with Mr. Davis. He asked Mr. Davis about what had happened and Mr. Davis told him "that he was leaving his girlfriend's

house when her ex-boyfriend entered the house.  That they fought over a gun and he got shot."  Mr. Davis told Officer Bishop that the ex-boyfriend had brought the gun into the house.

The police put out a bulletin on the Defendant advising that he might have eye injuries.  A call came in from the same hospital in which Mr. Davis was located that a man had come in with eye injuries.  Officer Bishop responded and found the Defendant in a trauma room.  The Defendant's eyes were bleeding.  Officer Bishop asked the Defendant his name, and the Defendant responded, "Roosevelt Morris."  Officer Bishop placed the Defendant under arrest.  Officer Bishop had no further conversation with the Defendant.

Sergeant Michelle Oliver testified that she was one of the crime scene officers investigating this case.  At the scene, she found broken glass on the front porch and what appeared to be blood.  She described the items inside the front room of the house as "disheveled."  She and Officer Alvin Peppers collected two empty shell casings from inside the house and she saw two holes in one of the walls that appeared to have been made by bullets.  They found no shell casings in the yard.  She did not test for any fingerprints at the scene.

Officer Alvin Peppers, who assisted Sgt. Oliver as a crime scene officer, testified that there appeared to have been a struggle inside the residence.  He described the two shell casings collected as .380 caliber.

The Defendant testified on his own behalf.  He acknowledged his past romantic relationship with Ms. Washington and agreed that they had lived together on Glankler for several months.  He offered a different explanation of why they broke up, however.  The Defendant testified that Ms. Washington had "at times . . . a very nasty attitude, and [was] very controlling and very demanding."  The Defendant also found Ms. Washington's mother "absolutely intolerable."  The final straw, however, was some nude photographs that Ms. Washington kept of her ex-boyfriends.  Ms. Washington refused to destroy the photographs in spite of the Defendant's request.  When he discovered that she had kept the photographs, he "just couldn't . . . take no more."  At that point, he moved out and they broke up.

The Defendant testified that Ms. Washington was pregnant at the time they broke up.  He stated that, after he left, she filled up his answering service with messages: "all of them were pleading [him] to come back home.  Why did [he] leave? . . . Oh, what about the baby?"  When he returned the calls a few days later, she was "absolutely furious."  She told him she was going to have an abortion.

The Defendant next spoke with Ms. Washington by telephone in January.  He described this conversation as "very amiable."  He stated that she told him that she had had the abortion, and wanted to know if he was interested in knowing if it was a boy or a girl.  He thought he remembered her telling him it was a boy.  Later that month, he testified, they got together and ate, went shopping, and then to a hotel.  The Defendant stated that he and Ms. Washington had consensual sexual contacts three or four times between January 2002 and May 18, 2002.  The Defendant also stated that he was aware of the order of protection during this time.

The Defendant testified that Ms. Washington left a message on his service on May 17, 2002. When he returned the call, she told him she wanted to get together. He asked her for a good time to come by, and she told him it would have to be after three a.m. so that Mr. Davis would be gone. She told him to knock "lightly" on the door and that if she did not answer, to leave. The Defendant followed these instructions. Ms. Washington opened the door and as he began to walk into the house, he noticed a "strange look" on Ms. Washington's face. The Defendant stated that it "wasn't a pleasant look." As he went through the door, he stated, he saw Ms. Washington looking beyond him and he felt a "presence" behind him. He turned around and saw Mr. Davis behind him with a gun.

According to the Defendant, he and Mr. Davis began struggling with the gun at that point. The Defendant described himself as five feet, six inches tall, 180 pounds, and said he knew what he had to do was to hold onto the hand in which Mr. Davis held the gun. The Defendant stated, "I would not let it go." During the struggle, Ms. Washington struck the Defendant on the back of his head with an object.

The Defendant stated that the gun went off several times during the struggle. The Defendant stated that the gun went off while they were in the house and that the struggle continued outside onto the porch where the gun discharged again. During the struggle, somebody started gouging him in his eyes. At some point he heard Mr. Davis say something about being hurt or hit or something and while Mr. Davis seemed distracted by his condition, the Defendant fled. He stated that he ran around to the next street and returned to the hotel room that he had rented for his "rendezvous" with Ms. Washington. From there he managed to drive to his brother's house where he was living, in spite of his "substantial[ly] injured" eyes. From there, he stated, his brother called 911. An ambulance arrived and took him to the hospital.

According to the Defendant, he had suffered from a "fractured skull" and "air on the brain." Additionally, "the protective skin over the outer eye was severely lacerated" and his corneas and retinas were "severely damaged." He was told, he said, that his fractured skull could not be treated and he was given "something, they said it would, they would dissolve that air bubble."

After hearing the above proof, the jury convicted the Defendant of two counts of criminal attempt to commit first degree premeditated murder.

## ANALYSIS
### I. Sufficiency of the Evidence
In his first issue, the Defendant contends that the evidence is not sufficient to support his convictions. Specifically, the Defendant challenges the credibility of the alleged victims' testimony and points out that "[t]here was no proof linking the gun's ownership to any of the parties, no fingerprints on the gun, or powder residue taken from [the Defendant's] hands to identify him as the owner and shooter of the gun." The State argues that the evidence is sufficient.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

We begin our analysis with a review of the elements of the crimes of which the Defendant was convicted. First degree premeditated murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is further defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. A person commits a criminal attempt to commit first degree premeditated murder when he or she acts with the intent to cause the premeditated killing and intentionally and with premeditation engages in conduct that constitutes a substantial step toward the commission of the killing. See id. § 39-12-101(a)(3); State v. Cowan, 46 S.W.3d 227, 233-34 (Tenn. Crim. App. 2000).

The Defendant does not contend that, taking the State's proof as true, the State failed to establish the elements of two counts of attempted premeditated murder. Rather, the Defendant

challenges the credibility of the victims and asserts that their testimony was not sufficiently corroborated by physical proof to establish the Defendant's guilt beyond a reasonable doubt. We respectfully disagree. As this Court has previously held, the testimony of a victim, standing alone, is sufficient to support a conviction. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Here, not just one but two victims identified the Defendant as their attacker. One of the victims was intimately familiar with the Defendant.

The physical proof complained of by the Defendant as missing does not avail him a different result. Even under the Defendant's own version of events, his fingerprints could have been on the gun and powder burns on his person. What the Defendant is asking this Court to do is to second-guess the jury's determination about the various witnesses' credibility. In this case, the jury accredited the victims' testimony and rejected the Defendant's. This, the jury had every right to do. This Court will not overturn a jury's determination of a witness's credibility.

Viewed in a light most favorable to the State, the evidence was sufficient to support the Defendant's convictions. He laid in wait outside Ms. Washington's house during the night while armed with a deadly weapon. When she opened her door, unarmed and unsuspecting, he fired two shots at her. One bullet came so close to her head that she felt it go by. When she fell to the floor, he entered the house and continued shooting, striking Mr. Davis in the chest. The shooting stopped long enough for Mr. Davis to tackle the Defendant only because the gun jammed. The Defendant told the victims during the struggle for the gun that he intended to kill them both. The Defendant's claim that the evidence does not support his convictions is without merit. Accordingly, the Defendant's two convictions for criminal attempt to commit first degree premeditated murder are affirmed.

## II. Excessive Sentence

After a sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender to a term of twenty-five years imprisonment for each conviction, to be served consecutively for an effective term of fifty years. In doing so, the trial court applied four enhancement factors to each conviction: that each offense involved more than one victim; that the Defendant employed a firearm during the commission of each offense; that the Defendant had no hesitation about committing each offense when the risk to human life was high; and each offense was committed under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(4), (10), (11), (17). In ordering the Defendant to serve his sentences consecutively, the trial court found the Defendant to be a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. See id. § 40-35-115(b)(4). The Defendant now complains that the trial court erred in its application of enhancement factors, relying on Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531 (2004). The Defendant further complains that the trial court erred in ordering his sentences to run consecutively.

### A. Standard of Review

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401 Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

### B. Application of Enhancement Factors

We turn first to the Defendant's contentions regarding the Blakely decision. In that case, the United States Supreme Court examined certain provisions of the State of Washington's sentencing scheme. Those provisions allowed a trial court to impose an "exceptional [that is, longer] sentence" after making a post-trial determination that certain statutory enhancement factors existed. This determination was to be made by the trial court without the benefit of a jury. The Supreme Court determined in Blakely that the protections in the Sixth Amendment to the United States Constitution would allow a defendant's sentence to be increased only if the enhancement factors relied upon by the trial court (other than prior criminal history) were based on facts reflected in the jury verdict or admitted by the defendant. See 124 S.Ct. at 2537. The Court concluded that "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id. at 2543. On the basis of this case, the Defendant argues that the trial court erred by enhancing his sentence based on facts not reflected in the jury verdict or admitted by him.

The Tennessee Supreme Court has considered the applicability of the Blakely decision to Tennessee's sentencing scheme in State v. Gomez, 163 S.W.3d 632 (Tenn. 2005). In Gomez, our high court concluded that Tennessee's sentencing structure does not violate a criminal defendant's Sixth Amendment right to a jury trial. See id. at 661. Accordingly, the Defendant's argument on this issue is misplaced. The Defendant is not entitled to relief on this basis.

We find pursuant to our de novo review, however, that the trial court erroneously applied certain enhancement factors in a manner contrary to law. Our Criminal Sentencing Reform Act of 1989 provides for the application of certain enhancement factors to a defendant's presumptive sentence if they are "appropriate for the offense" and "not themselves essential elements of the offense as charged in the indictment." Tenn. Code Ann. § 40-35-114. Moreover, our supreme court has recognized that "factors which are inherent in a particular offense, even if not designated as an element, should not be given substantive weight in increasing a sentence." State v. Pike, 978 S.W.2d 904, app. 927 (Tenn. 1998). Nevertheless, the trial court in this case applied two enhancement factors that are inherent in the crime of attempted premeditated murder: that the Defendant had no hesitation about committing a crime when the risk to human life was high, and that he committed the crimes under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(11), (17). This Court has previously held that these enhancement factors cannot be applied to a conviction for attempted first degree murder "because the risk to human life and the great potential for bodily injury always exist with an attempted first degree murder." State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). See also Pike, (holding it inappropriate to apply the "no hesitation" factor to a conviction of conspiracy to commit first degree murder). Accordingly, the trial court erred when it enhanced the Defendant's sentences on the basis of these two factors.

The trial court also erred when it enhanced the Defendant's sentences for each crime on the basis that each offense involved more than one victim. See Tenn. Code Ann. § 40-35-114(4). This Court has held that this factor may not be applied when the defendant is separately convicted of the offenses involved against each victim. See State v. Freeman, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996). Here, there were only two victims and the Defendant was separately convicted of an offense as to each victim. Moreover, our supreme court has held that there cannot be multiple victims for any single offense where the indictment specifies a named victim. See Imfeld, 70 S.W.3d at 706. The Defendant was charged in a two count indictment in which Count 1 specified that the Defendant had attempted to commit first degree premeditated murder against Teresa Washington, and Count 2 specified that the Defendant had attempted to commit first degree premeditated murder against James Davis. Accordingly, the trial court should not have enhanced either of the Defendant's sentences on the basis that the offenses involved more than one victim.

The trial court properly enhanced each of the Defendant's sentences on the basis that the Defendant used a firearm during the commission of the crimes. See Tenn. Code Ann. § 40-35-114(10); State v. Jackson, 946 S.W.2d 329, 334 (Tenn. Crim. App. 1996). Moreover, we find that the Defendant's sentence for his attempted murder of James Davis should be enhanced on the basis that the Defendant's actions during the commission of the felony resulted in serious bodily injury

to James Davis. See Tenn. Code Ann. § 40-35-114(13). Mr. Davis testified that the Defendant shot him in the right chest. He also testified that the bullet remained in his body because "it would do more damage taking it out . . . because they'll have to split [his] chest open to get it." Ms. Washington also testified at the sentencing hearing that Mr. Davis was in the hospital as a result of this wound for "a few" weeks. We have no difficulty concluding that Mr. Davis' gunshot wound satisfies the definition of "serious bodily injury." See id. § 39-11-106(34). Moreover, this Court has previously held that this enhancement factor applies to a sentence for attempted murder where the victim is actually injured during the commission of the crime. See Freeman, 943 S.W.2d at 32. Accordingly, the trial court should have applied this enhancement factor to the Defendant's sentence for the attempted murder of Mr. Davis.

The Defendant was convicted of two Class A felonies. See Tenn. Code Ann. § 39-11-117(a)(2). The presumptive sentence for a Class A felony is the midpoint of the applicable range. See id. § 40-35-210(c). The Defendant was sentenced as a Range I, standard offender. The Range I sentence for a Class A felony is fifteen to twenty-five years. See id. § 40-35-112(a)(1). Accordingly, the presumptive sentence for each of the Defendant's convictions is twenty years.

The Defendant's sentence for his attempted murder of Teresa Washington was properly enhanced by one enhancement factor: that the Defendant used a firearm in the commission of the offense. See id. § 40-35-114(10). An increase of two years in the Defendant's presumptive sentence of twenty years is appropriate for the application of this single enhancement factor. Because the trial court erroneously applied three additional enhancement factors to arrive at a sentence of twenty-five years, we modify the Defendant's sentence for his attempted murder of Teresa Washington to twenty-two years.

The Defendant's sentence for his attempted murder of James Davis is properly enhanced by two enhancement factors: that the Defendant used a firearm in the commission of the offense, and that the Defendant's actions during the commission of the offense caused James Davis to suffer serious bodily injury. See id. § 40-35-114(10), (13). An increase of five years to the Defendant's presumptive sentence of twenty years is appropriate for the application of these two enhancement factors. Accordingly, we affirm the trial court's imposition of a twenty-five year sentence for the Defendant's attempted murder of James Davis.

### C. Consecutive Sentencing

We turn now to the Defendant's contention that the trial court erred in ordering him to serve his sentences consecutively. The Criminal Sentencing Reform Act of 1989 provides that, where a defendant is convicted of more than one criminal offense, the trial court may order the sentences to run consecutively if it finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Our supreme court instructs us that, in ordering consecutive sentences on the basis of this criterion,

[p]roof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of Section 40-35-115 cannot be read in isolation from the other provisions of the Act. <u>The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender.</u>

State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995) (emphasis added).

In finding the Defendant to be a dangerous offender, the trial court emphasized the circumstances of the offenses and the fact that the Defendant violated a protective order in attacking the victims. We agree with the trial court that the Defendant's conduct in committing the instant offenses indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Indeed, the proof established that the Defendant was actively and deliberately trying to kill two persons. Moreover, we find that the proof established that consecutive sentences were necessary in order to protect the public from further criminal acts by the Defendant. This Defendant was under an order of protection at the time he laid in wait and opened fire on two unarmed and unsuspecting individuals during the dead of night. The Defendant had no qualms about taking the law into his own hands. Clearly, the Defendant was unimpressed by a court order demanding that he cease contacting a person he had been harassing. Obviously, the only way to protect the public from this Defendant is to separate him therefrom.

We further find that the aggregate term of forty-seven years is reasonably related to the severity of the Defendant's crimes. The Defendant committed one of the most terrifying acts known to our society: he armed himself, laid in wait at a victim's home during the dark of night, and then opened fire on his unsuspecting and unarmed victims. The Defendant then invaded the victim's home and continued trying to kill its occupants. Only the fact that the Defendant's gun jammed kept him from firing additional shots. The Defendant succeeded in shooting one of his intended victims. He came so close to shooting his other intended victim that she felt the breeze of the passing bullet near her head. It is amazing that the Defendant did not kill either of his victims. He did seriously wound one of them. The Defendant's conduct deserves a lengthy prison term.

The Defendant argues in his appellate brief that concurrent sentences should be ordered because he "will be an old man, extremely unlikely to be dangerous to anyone, after serving a twenty to twenty-five year sentence." We reject this argument. As this Court has previously observed, "the underlying principle behind consecutive sentencing 'is not whether the length of the sentence is logical based on the age of the defendant at sentencing, but whether a defendant should "escape the full impact of punishment for one of [his] offenses."'" State v. Charles O. Emesibe, No. M2003-02983-CCA-R3-CD, 2005 WL 711898, at *13 (Tenn. Crim. App., Nashville, March 28, 2005) (quoting State v. Timothy Clayton Thompson, No. E2002-01710-CCA-R3-CD, 2003 WL 21920247,

at *5 (Tenn. Crim. App., Knoxville, Aug. 12, 2003)). The Defendant's contentions regarding the imposition of consecutive sentences are without merit. Accordingly, we affirm the trial court's imposition of consecutive sentences on the basis that the Defendant is a dangerous offender.

## CONCLUSION

We affirm the Defendant's convictions. We modify the Defendant's sentence for his attempted murder of Teresa Washington to twenty-two years. We affirm the Defendant's sentence of twenty-five years for his attempted murder of James Davis. We affirm the trial court's imposition of consecutive sentences, for an effective term of forty-seven years.

_____
DAVID H. WELLES, JUDGE