**STATE of Tennessee, Appellee,**

v.

**Charles Edward JACKSON, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Sept. 5, 1996.

Permission to Appeal Denied by Supreme Court March 10, 1997.

**330** ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Ardena J. Garth, District Public Defender, Donna Robinson Miller, Asst. District Public Defender, Chattanooga, for appellant.

Charles W. Burson, Attorney General and Reporter, Darian B. Taylor, Asst. Attorney General, Nashville, Gary D. Gerbitz, District Attorney General, Leland Davis, Asst. District Attorney General, Chattanooga, for appellee.

## *OPINION*

PEAY, Judge.

The defendant was charged in the indictment with attempted first-degree murder. He was found guilty at a jury trial and was sentenced to twenty-two years in the Department of Correction. In this appeal as of right, the defendant challenges the sufficiency of the convicting evidence and the length of his sentence. We find that the defendant's issues are without merit, and his conviction and sentence are therefore affirmed.

The pertinent facts are not in serious dispute. The defendant met the victim, Nora Kimbell, in the summer of 1993, and they began a romantic relationship in September of 1993. In January of 1994, they both agreed not to date any other individuals, making their romantic relationship an exclusive one. On February 23 or 24, 1994, Kimbell spoke to the defendant to confirm their plan to ride the defendant's motorcycle along a scenic route from Chattanooga into Georgia on Saturday, February 26. Kimbell took a vacation day on February 25 and had lunch with Mark Bailey, a current friend and former boyfriend. After lunch, she went to the defendant's home, arriving at approximately 4:00 in the afternoon. Although the defendant was tired from having worked the previous night, the couple went to Chattanooga Honda to run an errand and then to dinner.

They returned to the defendant's home and spent a quiet night there. Nothing out of the ordinary took place, but the victim did notice that the defendant was quite "intense" in telling her how much he cared for her. Unbeknownst to Kimbell, the defendant had telephoned Helen Harris, the mother of his ex-wife, earlier in the day and told her in an upset tone that he had "a problem." He also told her not to worry, however, and that he was "going to take care of it."

They first awakened at approximately 7:00 a.m. on the morning of February 26. The defendant got out of bed and looked out a window to check the weather. He returned to bed and told the victim that it looked cold outside, meaning that their motorcycle trip to Georgia would be delayed. They went back to sleep, and the victim next awakened at approximately 9:00 a.m., getting up to use the bathroom. When she returned to bed, the defendant was awake and was lying on his side facing her half of the bed.

As the victim climbed back into bed, the defendant began to exhibit unusual behavior. He started talking to the victim, saying "I know everything about you, I know all about your childhood." He then stated, "I don't like it whenever you go up the road." The victim assumed that the defendant was referring to her lunch with Mark Bailey because Bailey lived near the defendant. She told the defendant that she could not give up her friends. The defendant then stated "that he was a ghost, that he had died twice and that he knew everything." He continued talking about some individuals who had done "something real bad" to his ex-wife, stating that he had "a one-way ticket to hell" for one of the individuals.

At this point, Kimbell decided that the conversation had become too odd and started to get out of the bed. The defendant produced a kitchen knife with a seven-inch blade which he had hidden near the bed the previous day, forced the victim back onto the bed, and stabbed her in the chest. The defendant and the victim began to struggle over the knife. Although Kimbell was stabbed in the chest on multiple occasions, she was able to block some of the defendant's blows. On one of those occasions, the victim managed to

block a blow with her foot, resulting in the knife slicing her foot. Upon that occurrence, the defendant "grinned" and said, "you cut your little foot didn't you." The struggle resumed and Kimbell was actually able to wrest control of the knife from the defendant and drop it on the floor. The defendant then began to strangle her. She managed to remove the defendant's hands from her neck at least partially, prompting the defendant to recover the knife from the floor. Another struggle ensued in which Kimbell grabbed the defendant's hand as he was attempting to stab her again. The defendant told Kimbell that if she calmed down, he would call an ambulance. When she released hold of his hand, however, he stabbed her in the chest once again, this time leaving the knife protruding from her body. After approximately fifteen minutes, during which time the victim pleaded with the defendant to remove the knife due to the pain it was causing her, the defendant asked Kimbell if she felt the end was near. She responded affirmatively, and the defendant pulled the knife out of her chest.

For the next two and a half to three hours, Kimbell lay naked and bleeding on the bed with the defendant lying or standing beside her for most of that time. As he had done during the physical attack, the defendant kept repeating that they were "both going to die." According to his statement to police, the defendant had made up his mind the previous day to kill the victim and then to kill himself with the same knife. Kimbell talked almost constantly during the hours after the attack in order to maintain consciousness. At one point, she told the defendant how ugly it was for her to die like this and for her mother to find her naked and dead from the stab wounds. The defendant replied that there "wasn't going to be anything left for [her] mother to find." At a later time, Kimbell complained about the pain from the wounds and asked the defendant why he didn't attempt to kill her in a more humane way. The defendant then offered to finish strangling her, but Kimbell refused the offer.

Approximately three hours after the attack, the tone of the defendant changed. He no longer repeated that they were both going to die, but instead began to say "what about me." The defendant then left the bedroom and telephoned a neighbor, Dennis Sampson. He asked Sampson to come to his home, but Sampson informed the defendant that he did not have time to do so. The defendant walked back into the bedroom where the victim was still lying naked and bleeding. At this point, the victim pleaded with the defendant to call 911. The defendant left the bedroom and did in fact call 911. He returned to the bedroom and the victim once again pleaded with the defendant to call 911, saying that she did not believe aid was coming. The defendant left the bedroom and telephoned Helen Harris, the mother of his ex-wife. He asked Harris to come to his home because he needed to talk. He informed her that he had hurt his girlfriend "real bad" and that the police were on their way to his home. The defendant then called Dennis Sampson again, asking him to call 911. At this time, approximately 12:30 p.m., an ambulance drove by Sampson's home and the defendant hung up. He returned to the bedroom, covered the victim with a sheet, and told her that he did not want her to die and that help was on the way.

Law enforcement officers arrived shortly after the ambulance and led the medical team into the defendant's home. The defendant met them at the door, telling the officers that he had stabbed Kimbell and that she was in the back bedroom. The victim was transported to a hospital, and the defendant was arrested and taken to the county jail, where he gave a voluntary statement concerning the attack. The defendant could not explain exactly why he had stabbed Kimbell, other than that he was just a "jealous type" of person and he was afraid he was going to lose her, even though there were no indications that something was amiss in their relationship. As far as what prompted the defendant to call 911, the defendant stated simply that he was "tired of watching [Kimbell] hurt" and that he no longer wanted her to die.

Dr. Robert Headrick, Jr. testified that he had been the surgeon for the victim once she had arrived at the hospital. The victim's injuries included five stab wounds to the

chest and a laceration of one foot. The victim also exhibited wounds about her neck which indicated an attempt at strangulation. Headrick testified that although the victim's wounds had been quite serious, she had the good fortune that none of the stab wounds had penetrated a major organ or artery. If any of the stab wounds had penetrated a major organ or artery, Kimbell would have died within a matter of minutes. Headrick was able to close the victim's wounds and she eventually recovered, but he did testify that Kimbell would have died from her wounds without medical treatment.

In his first issue on appeal, the defendant challenges the sufficiency of the convicting evidence. More specifically, the defendant claims that he adequately raised the affirmative defense of renunciation and the State failed to negate the existence of the defense beyond a reasonable doubt, as is required under T.C.A. § 39–11–201(a)(3). The renunciation defense is defined as follows:

> It is an affirmative defense to a charge of criminal attempt ... that the person, after committing the criminal attempt ... prevented the successful commission of the offense attempted ... under circumstances manifesting a complete and voluntary renunciation of the person's criminal purpose.

T.C.A. § 39–12–104 (1991). The defendant contends that, by telling the victim that he did not want her to die and by calling 911 for medical aid, he clearly renounced his criminal attempt to murder the victim.

When an accused challenges the sufficiency of the convicting evidence we must review the evidence in the light most favorable to the prosecution in determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the

proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. *Cabbage,* 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1973).

A defendant challenging the sufficiency of the proof has the burden of illustrating to this Court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This Court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982).

In the case of affirmative defenses such as renunciation, the burden of raising the defense rests with the defendant. *See* T.C.A. § 39–11–204(d) (1991); T.C.A. § 39–11–204(e) (1991); T.C.A. § 39–12–104 Sentencing Commission Comments. We agree with the defendant, as did the trial court, that he adequately raised the renunciation defense by a preponderance of the evidence, as is required under T.C.A. § 39–11–204(e).[1] In fact, the trial court properly instructed the jury regarding the renunciation defense. The essence of the defendant's argument, then, is that the proof is insufficient as a matter of law to demonstrate that the State negated the renunciation defense beyond a reasonable doubt.

---

1. We note, as does the State on appeal, that there is nothing in the record which indicates that the defendant provided proper notice of his intention to rely upon a renunciation defense, as is necessary under T.C.A. § 39–11–204(c). The State, however, did not object at trial to the lack of notice and did not appear to be hampered by its absence. Accordingly, we conclude that the State has waived any complaint regarding the defendant's failure to comply with T.C.A. § 39–11–204(c).

From a review of the entire record in this case, we must conclude that the proof is sufficient, as a matter of law, to demonstrate that the State negated the renunciation defense beyond a reasonable doubt. The record reveals that the defendant decided to murder the victim on February 25 and concealed a knife for that purpose. On February 26, he stabbed Kimbell five times in the chest and attempted to strangle her. After approximately three hours of waiting for the victim to die, during which time the defendant had been steadfast in saying that he intended to end both of their lives, the defendant's tone changed and he began to think of himself, repeating "what about me" to the victim. He then called 911 in response to the victim's pleading for her life. From the verdict of guilt, we can infer that the jury did not consider these circumstances to manifest a complete and voluntary renunciation. The jury apparently drew a distinction between a complete, voluntary renunciation and the defendant's simple failure to achieve his criminal purpose followed by actions to "cut his losses" in some way. It seems that the principal reason for the victim's survival of the attack was the sheer luck that none of the knife wounds penetrated a major organ or artery, while the defendant's actions in summoning aid were secondary. Moreover, it appears from the record that the defendant was simply tired of watching the victim die rather than truly not wanting her to die.

The issue of renunciation was one for the jury to resolve after hearing all of the relevant proof, and they resolved it against the defendant. We find that there is evidence to support the jury's conclusion that the circumstances surrounding the commission of the offense do not indicate a voluntary, complete renunciation on the part of the defendant. From our review of the record, we can only conclude that the facts are legally sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. The defendant has failed to carry his burden, and his first issue is therefore without merit.

In his second issue on appeal, the defendant challenges the length of his sentence. More specifically, the defendant argues that his twenty-two year sentence is excessive under the facts of his case, given the fifteen to twenty-five year possible range of his sentence. He contends that the only applicable enhancing factor is that he allowed the victim to be treated with exceptional cruelty during the commission of the offense. *See* T.C.A. § 40–35–114(5). In contrast, the defendant claims that the fact that he called 911, his excellent employment history, that he has no prior record other than convictions for harassing telephone calls in 1992 and malicious mischief in 1976, that he accepted responsibility for the crime, that he felt remorse, and that he cooperated fully with law enforcement officials should all have been considered pursuant to the "catchall" mitigating factor, T.C.A. § 40–35–113(13). Accordingly, after weighing the various enhancing and mitigating factors, the defendant argues that he merits a sentence closer to fifteen years.

When a defendant complains of his or her sentence, we must conduct a *de novo* review with a presumption of correctness. T.C.A. § 40–35–401(d). The burden of showing that the sentence is improper is upon the appealing party. T.C.A. § 40–35–401(d) Sentencing Commission Comments. This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991).

A portion of the Sentencing Reform Act of 1989, codified at T.C.A. § 40–35–210, established a number of specific procedures to be followed in sentencing. This section mandates the court's consideration of the following:

(1) The evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40–35–113 and 40–35–114; and (6) [a]ny statement the defendant

wishes to make in his own behalf about sentencing.

T.C.A. § 40–35–210.

In addition, this section provides that the minimum sentence within the range is the presumptive sentence. If there are enhancing and mitigating factors, the court must start at the minimum sentence in the range and enhance the sentence as appropriate for the enhancement factors and then reduce the sentence within the range as appropriate for the mitigating factors. If there are no mitigating factors, the court may set the sentence above the minimum in that range but still within the range. The weight to be given each factor is left to the discretion of the trial judge. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn.Crim.App.1992).

The Act further provides that "[w]henever the court imposes a sentence, *shall place on the record* either orally or in writing, what enhancement or mitigating factors." § 40–35–210(f) (emphasis added). Because of the importance of enhancing and mitigating factors under the sentencing guidelines, even the absence of these factors must be recorded if none are found. T.C.A. § 40–35–210 comment. These findings by the trial judge must be recorded in order to allow an adequate review on appeal.

■ On April 13, 1995, the trial court conducted a sentencing hearing in the present case. The State offered testimony from the victim concerning the circumstances surrounding the commission of the offense, and the defendant offered no proof on his behalf. Both the State and the defendant agreed that certain portions of the presentence report should not be considered for sentencing purposes. Other than the testimony from the victim and the undisputed information in the presentence report, both the State and the defendant relied solely upon argument presented to the trial court at the sentencing hearing. After hearing all of the proof and the argument from counsel, the trial court took a short recess to review the presentence report and the statutory sentencing guidelines.

The trial court then found that the defendant had treated the victim with exceptional cruelty, rendering T.C.A. § 40–35–113(13) applicable as an enhancing factor. The trial court found further that the defendant deserved "some credit for making the 911 call," presumably rendering T.C.A. § 40–35–113(13) applicable as a mitigating factor. In weighing the various factors, however, the trial court expressly stated that the "exceptional cruelty" enhancement factor deserved significant weight due to the egregious circumstances of the offense. As a result, the trial court set the defendant's sentence at twenty-two years.

From our review of the record, it is clear that the trial court properly considered all relevant sentencing principles and circumstances surrounding the offense. The defendant complains that the trial court, when discussing the mitigating factors applicable to the case at bar, did not comment upon his work history, his acceptance of responsibility, or his cooperation with police officers. Yet at no time during the sentencing hearing did the defendant specifically bring this information to the trial court's attention, either through witness testimony or argument. Moreover, the trial court was already generally aware of these facts from the proof at trial and at the sentencing hearing. It seems that the trial court simply found that the information did not merit consideration as a mitigating factor. From the great weight assigned by the trial court to the "exceptional cruelty" enhancement factor, it is obvious that these facts had a minimal impact on the defendant's sentence. The trial court was in a far better position to appreciate the cruel nature of this offense and to weigh it against the defendant's actions near the end of the victim's three hour ordeal.

In addition, as the State points out on appeal, the trial court could properly have found other enhancement factors. Because the defendant used a knife in his attempt to murder the victim, the record supports the application of enhancement factor nine, that the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense. *See* T.C.A. § 40–35–114(9). The record also supports the application of enhancement factor fifteen, that the defendant abused a position

of private trust in the commission of the offense. *See* T.C.A. § 40–35–114(15). The defendant made up his mind to kill the victim and then took advantage of his intimate relationship with her to gain the opportunity to attack while she was alone in his home and acutely vulnerable. Thus, we conclude that the trial court considered relevant factors and that its findings of fact were adequately supported by the record. It is not this Court's function to substitute our judgment for that of the trial court. *See State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn.Crim. App.1991). The defendant has failed to carry his burden to demonstrate that his sentence is improper, and his second issue therefore lacks merit.

For the reasons set out in the foregoing discussion, we find that the defendant's issues on appeal are without merit. His conviction and sentence are therefore affirmed.

SMITH, J., concurs with separate opinion.

JOHN K. BYERS, Senior Judge, concurs.

SMITH, Judge, concurring.

I concur fully in the holding of the Court that the defendant's conviction and sentence for attempted first degree murder must be affirmed. I write separately only to express my views on the defense of renunciation under the circumstances presented by cases such as the one *sub judice*.

The theory behind the defense of renunciation may be found in the Sentencing Commission comments to Tennessee Code Annotated Section 39–12–104. The availability of this defense is to "provide an incentive for offenders to abandon their criminal purpose before they accomplish their criminal goal." *Id.* This is, however, a laudable goal only if the defendant abandons his or her criminal purpose before any actual physical or pecuniary harm befalls the victim of the criminal activities. To allow an individual such as the defendant in this case to use renunciation to avoid punishment altogether for a serious aggravated assault simply because he ultimately abandoned his attempt to kill the victim would be unconscionable.[1]

I would limit the availability of renunciation to those situations where the inchoate crimes for which it is a defense are abandoned before any harm befalls the victim. However, once actual harm has resulted from the defendant's actions, his or her incentive to abandon the criminal enterprise must come from the fact that the completed crime will carry far more serious penalties than attempt, solicitation, or conspiracy.

---

1. The real problem in this case is that following the indictment for attempted murder, the Tennessee Supreme Court decided the case of *State v. Trusty*, 919 S.W.2d 305 (1996). Under the holding of *Trusty*, aggravated assault is not a lesser included offense, nor a lesser grade of attempted murder. Thus, since aggravated assault is not charged in the indictment either explicitly or by necessity, if the defense of renunciation is applicable in this case, the defendant would escape any accountability for his attack on the victim.