IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. MICHAEL BAKER a/k/a MICHAEL SIMMONS

**Appeal from the Criminal Court for Shelby County**
**No. 13-00845    Chris Craft, Judge**

---

**No. W2013-02184-CCA-R3-CD  - Filed January 27, 2015**

---

Michael Baker a/k/a Michael Simmons ("the Defendant") was charged with first degree murder in the attempt to commit robbery, criminal attempt: especially aggravated robbery, and criminal attempt: aggravated robbery. The jury convicted the Defendant as charged, and the trial court sentenced him to life plus ten years. On appeal, the Defendant argues the evidence was insufficient to support his convictions. After a review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Stephen Bush, District Public Defender; Robert Trent Hall and Jim Hale, Assistant Public Defenders (at trial); and Phyllis Aluko, Assistant Public Defender (on appeal), Memphis, Tennessee, for the appellant, Michael Baker a/k/a Michael Simmons.

Robert E. Cooper, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Lora Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Following a jury trial, Michael Baker a/k/a Michael Simmons ("the Defendant")[1] was convicted and sentenced as follows:

| Count | Charge | Victim | Sentence |
|---|---|---|---|
| 1 | First Degree Murder in the Commission of or Attempt to Commit Robbery | Ronald Farmer | Life |
| 2 | Criminal Attempt: Especially Aggravated Robbery | Ronald Farmer | 20 years |
| 3 | Criminal Attempt: Aggravated Robbery | Michael Griffin | 10 years |

The trial court ordered the sentences for Counts 1 and 2 to run concurrently with each other but consecutively to the sentence for Count 3, for a total effective sentence of life plus 10 years.

On appeal, the Defendant claims the evidence was insufficient to support the convictions. Upon review of the record and the applicable law, we affirm the judgments of the trial court.

**Factual Background**

Around 12:00 a.m. August 26, 2011, Michael Griffin and Ronald Farmer were walking down Elvis Presley Boulevard in Memphis toward Mr. Griffin's mother's neighborhood for the purpose of buying marijuana. Because there was very light traffic at that time of night, they noticed that a black van passed them three times. The third time the van turned off Elvis Presley Boulevard onto Dunn Avenue. Because he was concerned about the van, Mr. Griffin asked Mr. Farmer if he was armed, and Mr. Farmer responded that he was.

As Mr. Griffin and Mr. Farmer approached Dunn Avenue, a man wearing a black shirt, black hat, black gloves, and a black "veil" across his face came running toward them, waiving a gun. Mr. Griffin and Mr. Farmer immediately froze and put their hands in the air.

---

[1] A co-defendant, Jamarius Barnum, was also charged for the same incident but was tried separately.

The gunman told Mr. Griffin and Mr. Farmer to give him their money. Mr. Farmer said, "Bro, we ain't got nothing." The gunman then shot Mr. Farmer. While pointing the gun at Mr. Griffin, the gunman backed toward Dunn Avenue and got into the van on the passenger's side. The van drove away.

Mr. Griffin tried to help Mr. Farmer. First, Mr. Griffin threw Mr. Farmer's gun into the bushes on the side of the road because he did not want Mr. Farmer to get into trouble for having a gun. Then he picked up Mr. Farmer and tried to walk down Elvis Presley Boulevard to flag down a car for help. He stated that four cars passed him during this time, but none stopped to help. However, the police arrived a few minutes after the shooting. Mr. Griffin told the police that he and Mr. Farmer had been followed by "a black van that had a silver chrome ladder on the right side of it [and a] spare tire marking on the back left side of it."

Approximately five minutes after the police arrived at the scene, Mr. Griffin learned that other police units had stopped the van. The officers transported Mr. Griffin from the scene of the shooting to the location where the van had been stopped. Mr. Griffin identified the van and the passenger as the gunman.

Later that morning, Mr. Griffin was transported to the police department to give a second statement. Mr. Griffin was shown a photo spread, but he was unable to identify the gunman.

Mr. Griffin stated that he was standing about a foot away from Mr. Farmer when the gunman appeared, and the gunman was about four to five feet away from Mr. Farmer when he fired. According to Mr. Griffin, Mr. Farmer never reached for his own gun.

At trial, Mr. Griffin testified that even though the lighting conditions were not good that night, he could see the gunman and the van. He did not see the driver. He confirmed that the van parked on Dunn Avenue was the same van that he had seen before Mr. Farmer was shot.

On cross-examination, Mr. Griffin confirmed that he had given statements to the police, in which he said the suspect never pointed the gun at him. However, Mr. Griffin maintained that this portion of his statements was incorrect. On redirect examination, Mr. Griffin explained that the gunman waived the gun back and forth, before he intentionally pointed the gun at Mr. Farmer. Mr. Griffin testified he was afraid for both his and Mr. Farmer's lives.

Charles Benson testified that he was driving southbound on Elvis Presley Boulevard around 12:15 am on August 26, 2011, when he saw two men coming out from a side street. He stated that one of the men had his companion's arm draped around his shoulder like he was trying to help him. After Mr. Benson passed them, he continued to watch the men in his rearview mirror and saw one of the men fall to the ground. When Mr. Benson crested the next hill, he saw a police car. He stopped and told the officer that there were two men who needed help. The police left in the direction he indicated, and Mr. Benson continued to a nearby store. After he left the store, Mr. Benson stopped at the scene of the shooting to check on the men. He also gave a statement to the police.

Officer Melissa Mahan of the Memphis Police Department testified that she and her partner were completing a traffic stop near Elvis Presley Boulevard when a car pulled over and reported that there was a man down near Dunn Avenue, which according to Officer Mahan, was "literally just over the hill" from where they were. "Within a second" of leaving the traffic stop she and her partner arrived at the scene. One black male was lying in the roadway and another black male was standing beside him, screaming that they had been robbed. Officer Mahan got a description of the suspect and van and radioed other units. Within a few minutes, she received a radio communication that officers had stopped a van matching the description. Officer Mahan's partner left to help with the van, while Officer Mahan stayed behind to secure the scene until additional officers arrived. Officer Mahan observed that the man lying in the road appeared to have been shot and was bleeding.

Officer Justin Tutor of the Memphis Police Department testified that he responded to Officer Mahan's radio broadcast about the shooting. The description of the van matched a vehicle he had previously seen in the neighborhood. Officer Tutor stopped the van a couple of blocks from the scene of the shooting. He approached the passenger-side, and ordered the occupants out of the vehicle. When the occupants did not comply, Officer Tutor opened the passenger-side door and physically removed the passenger from the vehicle. Officer Tutor identified the Defendant as the person he removed from the van.

Officer Tutor and his partner transported the Defendant and the van's driver to the police department. When the officers escorted the Defendant through a door bearing a sign that read "homicide," the Defendant asked, "Damn, is dude dead?" Neither Officer Tutor nor his partner had said anything about the victim to the Defendant before the Defendant's comment.

Officer Marcus Mosby of the Memphis Police Department Crime Scene Investigation Unit testified that he responded to the scene of the shooting at approximately 1:30 a.m. on August 26, 2011. When he arrived at the scene, it had already been secured by uniformed officers. He stated that the scene was not well lit but that street lights provided some light.

While at the scene, Investigator Mosby photographed a .380 handgun found in the grass by the road, a nine millimeter cartridge case found at the intersection of Dunn Avenue and Elvis Presley Boulevard, and a substance he suspected was blood found on the street at the same intersection. Officer Mosby collected the cartridge case and .380 handgun as evidence.

Sergeant Tim Murphy of the Memphis Police Department testified that he took Mr. Griffin's preliminary statement at the scene and a second statement at the police department. Mr. Griffin explained that the gun found at the scene belonged to Mr. Farmer and that he threw it into the grass because he was afraid Mr. Farmer would get into trouble for having a weapon. Sergeant Murphy also photographed the Defendant when he was brought into the police department. At the time of his arrest, the Defendant was wearing a black shirt and black jeans.

On cross-examination, Sergeant Murphy read a portion of Mr. Griffin's statement that said, "Did the suspect ever point the gun in your direction? No, he just pointed his words at me." Sergeant Murphy confirmed that Mr. Griffin reviewed the statement and initialed the bottom of each page.

Officer David Payment of the Memphis Police Department Crime Scene Investigation Unit testified that after taking photographs, he conducted a search of the van at the police department pursuant to a search warrant and recovered a nine millimeter pistol, two black blouses, two brown gloves, two black gloves, and a red bandana. The pistol loaded with ten live rounds was found under the mat on the front passenger-side floorboard. Officer Payment stated that he was unable to find any fingerprints on the pistol. However, he stated that, if the shooter was wearing gloves, then he would not expect to find fingerprints.

Dr. Karen Chancellor, Chief Medical Examiner for Shelby County, testified that she conducted the autopsy of Mr. Farmer. Mr. Farmer had one gunshot wound on the left side of his chest. Through x-rays, Dr. Chancellor determined that the bullet was still inside Mr. Farmer's body. She removed the bullet and sent it to the Tennessee Bureau of Investigation ("TBI") for analysis. Dr. Chancellor stated that there was no gunshot residue on Mr. Farmer's body or clothing, so she was unable to calculate the distance from which Mr. Farmer was shot. However, she was able to determine that the bullet passed through both lungs and the heart, causing massive internal bleeding and death.

TBI Special Agent Cervinia Braswell testified as an expert in firearms identification. Agent Braswell compared the bullet identified as being recovered during Mr. Farmer's autopsy and the nine millimeter cartridge case found at the scene with bullets and cartridge cases test fired by the Jimenez nine millimeter pistol identified as being recovered from the van. Agent Braswell determined that the bullet recovered from the autopsy and the cartridge

case found at the scene had the same unique markings, which she referred to as the "mechanical fingerprint," as those found on the bullets and cases from the test fired pistol. She opined the bullet identified as coming from the autopsy and cartridge case identified as being found at the scene were fired by the Jimenez nine millimeter pistol.

Sergeant Joe Stark of the Memphis Police Department testified that he took the Defendant's statement. Before questioning him, Sergeant Stark advised the Defendant of his Miranda rights. The Defendant waived his rights and gave a statement, which was reduced to writing. In his statement, the Defendant admitted to killing Mr. Farmer. The Defendant stated that, earlier in the day on August 26, 2011, Jamarius Barnum asked him if he wanted to participate in a robbery. At first, the Defendant said no, but he eventually agreed to participate and told Mr. Barnum to pick him up at his house at 10:30 that evening.

By the time that Mr. Barnum arrived at the Defendant's house, the Defendant claimed he had decided not to participate in the robbery, but he did not communicate that to Mr. Barnum. Instead, the Defendant drove the van around the neighborhood trying to run the van out of gas so that he would have an excuse to abandon the robbery plan. However, when the Defendant stopped to use the restroom, Mr. Barnum took over driving and drove the van through the Bunker Hill neighborhood to find someone to rob. While driving down Elvis Presley Boulevard, they saw two men walking down the road. Mr. Barnum turned into a side street and parked the van. He gave the Defendant a gun and showed him how to operate the safety. Mr. Barnum instructed the Defendant to leave the safety on. The Defendant exited the van and jogged toward the two men. When he was about four to five feet away from them, the Defendant demanded their money. At this point, the Defendant said:

> . . . I realized I still have the safety on from when [Mr. Barnum] put it on, so I'm fumbling with the safety trying to get it off. When I felt like I did turn the safety on I aimed the gun back at [Mr. Farmer] and kept asking for the money. The next thing I know the gun went off and when I regained focus I looked back at the dude and I seen [sic] him holding his face and falling to the ground. That's when I realized I might [sic] hit him so I panicked and ran to the van.

When asked what he was wearing at the time of the shooting, the Defendant said he was wearing a black t-shirt, black shoes, black gloves, and a black blouse as a mask. He said the last time he saw the gloves and blouse, they were in the van. He also stated that Mr. Barnum was a member of a gang. At the end of his statement, the Defendant said he did not want to harm anyone; he was confused as to whether the gun's safety mechanism was on, and he thought he had turned it on so that it would not shoot.

Based upon the evidence, the jury found the Defendant guilty as charged on all three counts.

## Analysis

First degree felony murder is, "A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child, or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (2010). The *mens rea* required for a conviction of first degree felony murder is the intent to commit the underlying offense. Tenn. Code Ann. § 39-13-202(b) (2010). In this case, the underlying offense was criminal attempt: especially aggravated robbery of Mr. Farmer and/or criminal attempt: aggravated robbery of Mr. Griffin. As charged in this case, a person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense, "acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2010). Additionally, "[c]onduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b) (2010). Especially aggravated robbery is a robbery accomplished with a deadly weapon where the victim suffers seriously bodily injury. Tenn. Code Ann. § 39-13-403(a) (2010). Robbery is "the intentional or knowing theft of property from a person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010).

Regarding the Defendant's conviction for criminal attempt: aggravated robbery of Mr. Griffin, as charged in this case, aggravated robbery is defined as a robbery "[a]ccomplished with a deadly weapon or by display of any articles used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a)(1) (2010). Criminal attempt as charged in this case and robbery are defined above.

### *Sufficiency of the Evidence*

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978),

-7-

superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This Court will not reweigh the evidence. Id.[2]

A guilty verdict destroys the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of illustrating why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted). On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The Defendant argues that the evidence was insufficient to convict him because the State failed to "disprove" the Defendant's claims in his statement to the police that he did not want to participate in the robbery and that he mistakenly shot Mr. Farmer while trying to ensure the gun's safety mechanism was on.[3] Additionally the Defendant argues that the jury should have received an instruction as to the affirmative defense of renunciation, and that if the jury had been so instructed, there was insufficient evidence to prove beyond a reasonable doubt that he intended to commit robbery.

Tennessee defines renunciation, in pertinent part, as "an affirmative defense to a charge of criminal attempt . . . that the person, after committing the criminal attempt . . . prevented the successful commission of the offense attempted . . . under circumstances manifesting a complete and voluntary renunciation of the person's criminal purpose." Tenn. Code Ann. § 39-12-104 (2010). Since renunciation is an affirmative defense, the defendant bears the burden of raising it at trial, and it must be established by a preponderance of the evidence. State v. Jackson, 946 S.W.2d 329, 332 (Tenn. Crim. App. 1996), Id., Sentencing

---

[2] In his brief, the Defendant urges this Court to reconsider the Jackson standard, contending that a closer look at that case requires us to affirm a conviction only if the evidence would convince "the *average* mind" of the defendant's guilt beyond a reasonable doubt. We decline.

[3] The Defendant did not file a pretrial notice of his intent to rely on the affirmative defense of renunciation. Even so, the Defendant claims the trial court should have instructed the jury on renunciation because the State had notice of the defense as a result of the Defendant's written statement that the Defendant did not want to commit the robbery, attempted to prevent the robbery from occurring, and fled without completing the robbery. The defendant claims that a renunciation defense was "fairly raised" by the proof at trial.

Comm'n Comments (2010). The defense only applies "when the offender: (1) prevents successful completion of the ultimate offense; and (2) voluntarily renunciates the criminal purpose." Id., Sentencing Comm'n Comments (2010).

The State argues that, because the Defendant did not raise the affirmative defense of renunciation at trial, this Court is barred from considering the issue on appeal. Additionally, the State notes that renunciation only applies to criminal attempt, solicitation, or conspiracy, see Tenn. Code Ann. § 39-12-104 (2010), and therefore it does not apply to the Defendant's first degree murder conviction. Finally, the State contends that, although the Defendant did not consummate the robbery, his failure to do so did not amount to "circumstances manifesting a complete and voluntary renunciation of [his] criminal purpose." See id. .

In this case, the Defendant did not give pretrial notice that he intended to rely on a renunciation defense. Additionally, the Defendant never argued renunciation as a defense at trial. Therefore, he failed to comply with the notice requirement to justify a jury instruction as to renunciation.

In some circumstances, without the request of the defendant, trial courts are obligated to give instructions to the jury as to the law governing issues or defenses raised by the evidence presented at trial. State v. Hawkins, 406 S.W.3d 121, 129 (Tenn. 2013). However, that obligation only extends to general defenses. Id. Affirmative defenses require pretrial notice,[4] and the question of their existence cannot be submitted to the jury unless it has been "fairly raised" by the proof and proper notice has been provided. Tenn. Code Ann. § 39-11-204 (c)(1), (d) (2010); Hawkins, 406 S.W.3d at 129 n.9. We conclude that renunciation was not fairly raised by the proof and that the Defendant was not entitled to a renunciation instruction.

Viewed in a light most favorable to the State, the evidence shows that the Defendant and Mr. Barnum were looking for victims to rob. The Defendant exited the van with a gun and approached the victims with the intent to rob them. The Defendant pointed the gun at Mr. Farmer and demanded he and Mr. Griffin give him their money. During the confrontation, the Defendant shot Mr. Farmer who died as a result of the gunshot wound. The Defendant does not deny any of these events happened. Moreover, by convicting the Defendant as charged, the jury discredited his statement to police that he did not want to go through with Mr. Barnum's robbery scheme. See Bland, 958 S.W.2d at 659 (stating a guilty

---

[4] "If a person intends to rely upon an affirmative defense, the person shall, no later than ten (10) days before trial, notify the district attorney general in writing, or at such time as the court may direct naming the affirmative defense(s) to be asserted, and file a copy of the notice with the clerk." Tenn. Code Ann. § 39-11-204(c)(1) (2010).

-9-

verdict accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the State's theory). Therefore, we find that the evidence was sufficient to support the Defendant's convictions for first degree felony murder and criminal attempt: especially aggravated robbery of Mr. Farmer.

Viewed in a light most favorable to the State, the evidence shows that the Defendant approached Mr. Griffin and Mr. Farmer with a gun. He waived the gun back and forth between the victims, eventually aiming the gun at Mr. Farmer. He demanded Mr. Griffin and Mr. Farmer to give him money. Mr. Griffin stated that the was in fear for his life. We find that this evidence was sufficient to support the Defendant's conviction of criminal attempt: aggravated robbery of Mr. Griffin.

## Conclusion

For the aforementioned reasons, we affirm the judgment of the trial court.


_____
ROBERT L. HOLLOWAY, JR., JUDGE

-10-